**James McCARTHER, Plaintiff,**

**v.**

**CAMELOT INN OF LITTLE ROCK, Defendant.**

**No. LR–76–C–195.**

United States District Court, E. D. Arkansas, W. D.

May 5, 1981.

Prather Randle, John W. Walker, John W. Walker, P.A., Little Rock, Ark., for plaintiff and intervenor.

James W. Moore, Tucker Raney Mathis, Friday, Eldredge & Clark, Little Rock, Ark., for defendant.

## MEMORANDUM AND ORDER

EISELE, Chief Judge.

Plaintiffs James McCarther and Richard Smith brought this employment discrimina-

tion suit pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.*, and to 42 U.S.C. § 1981, seeking to represent essentially a class of all blacks who had been or who might be discriminated against by the defendant with respect to their employment on the basis of their race. The defendant, Camelot Inn of Little Rock (Camelot), is a hotel, restaurant, and convention center in Little Rock, Arkansas.

On October 30, 1979, prior to certification of a class, Rick Presley was permitted to intervene as a plaintiff. In a Memorandum and Order entered on March 27, 1980, after a hearing on the plaintiffs' Motion for Class Certification, the Court dismissed the claims of plaintiff Richard Smith and intervenor Rick Presley, finding that the two had not fullfilled their obligations in the discovery stage of the case and that they would not be adequate class representatives. In the same Memorandum and Order, the Court certified plaintiff James McCarther as the representative of a class of "all black employees and ex-employees [of the Camelot] who have been at any time involuntarily terminated by the Camelot for racially discriminatory reasons...."[1] *McCarther v. Camelot Inn Of Little Rock*

(D.C.Ark., 1980), 513 F.Supp. 355. The issues in the case were thereby limited to class-wide claims of discriminatory termination presented by James McCarther on behalf of the certified class.

The trial of this case was held on March 31, and April 1, 2, 3 and 4, 1980. A preliminary analysis of the relevant legal principles serves as an outline for the Court's assessment of the facts in this case.

## A. Analysis of Legal Principles

Depending upon the evidence, there are two ways of establishing a Title VII violation, one being through the utilization of the disparate treatment theory and the other through the use of the disparate impact theory. *See Kirby v. Colony Furniture Company*, 613 F.2d 696, 702–04 (8th Cir. 1980). In some cases the evidence permits the plaintiff to advance both theories. In others, only one is available.

Plaintiffs' counsel indicated at the trial that he did not believe that there were any facially neutral policies at the Camelot which had a disparate impact upon blacks. On the basis of the evidence, the Court agrees.[2] Plaintiffs' post-trial brief is cap-

---

1. The Court realizes that this definition, technically analyzed in the context of Rule 23, is, in one respect, overly restrictive and underinclusive. Technically, the definition includes only those black employees "*who have been*" involuntarily terminated for racially discriminatory reasons. Of course, it would be impossible to render a judgment *against* such a class with regard to its claims of discriminatory discharge, although it would be possible to render a judgment *for* such a class.

If the defendants were to prevail in this case, the Court could merely decertify the class. Such a result would not, however, necessarily protect the defendant from subsequent actions by individual class members based on claims already litigated by the class representative. It would not unequivocally give the defendant the benefit of prevailing in a class action, to which it would be entitled under Rule 23.

Consequently, for purposes of the judgment, as required by Fed.R.Civ.P. 23(c)(3), the Court will use a definition of the class which comports with the understanding of the parties and the Court and which correctly defines the group represented by the plaintiff/class representative. The class might be defined either of two ways. It might be described as "all black

employees and ex-employees of the Camelot who claim to, or who might claim to, have been involuntarily terminated by the Camelot for racially discriminatory reasons at any time prior to the conclusion of the trial on the merits." In the alternative, it might be defined as "all black employees and ex-employees of the Camelot," with the claims permitted to be litigated by the class representative James McCarther limited to those arising out of allegedly racially discriminatory discharges. Under either definition, it would be possible to render a judgment for or against the plaintiff class, and for or against the defendant vis-a-vis the plaintiff class as contemplated by Rule 23.

2. If there were here any such pertinent facially neutral policy which had a disparate impact on blacks, it would be the policy of firing employees for good cause. Insofar as the plaintiff may be said to have made out a prima facie case of disparate impact regarding such policy, the defendant has proven that such a policy is justified by business necessity and has thus successfully rebutted any such prima facie disparate impact case.

tioned "Plaintiffs Established Disparate Treatment Through Individual Witnesses and 'Reinforced' This Proof With Statistics;" it commences with the statement, "Plaintiffs' principal thrust at trial was to present disparate treatment," citing *Kirby, supra,* 613 F.2d 697. Therefore, the Court will analyze the case principally as one based upon disparate treatment with, however, some additional analysis of plaintiffs' statistical evidence.

 In *Kirby,* the Eighth Circuit clarified its understanding of the "order and allocation of proof" under *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), in disparate treatment cases as follows:

> As noted above, proof of discriminatory motive is critical in a disparate treatment case. *Teamsters v. United States, supra,* 431 U.S. 324 at 335 n.15, 97 S.Ct. 1843 at 1854, 52 L.Ed.2d 396. By making a prima facie showing of disparate treatment, Title VII plaintiffs raise an inference of "discriminatory animus because experience has proved that in the absence of any other explanation it is more likely than not that those actions were bottomed on impermissible [*i.e.,* racial] considerations." *Furnco Construction Co. v. Waters, supra,* 438 U.S. 567 at 579–80, 98 S.Ct. 2943 at 2951, 57 L.Ed.2d 957. However, a "prima facie showing is not the equivalent of a factual finding of discrimination . . . ." *Id.* at 579, 98 S.Ct. at 2951. That is, the employer as a Title VII defendant does not have to prove absence of discriminatory motive to escape liability; a prima facie showing of disparate treatment shifts only the burden of producing evidence to the employer, not the burden of persuasion. *See Board of Trustees v. Sweeney, supra,* 439 U.S. 24 at 25, 99 S.Ct. 295 at 295, 58 L.Ed.2d 216; *id.* at 29, 99 S.Ct. 295 at 297 (Stevens, J., dissenting). As stated in *Furnco,*
>
> > the burden which shifts to the employer is merely that of proving that he based his employment decision on a legitimate consideration, and not an ille-

gitimate one such as race . . . . To dispel the adverse inference from a prima facie showing [of disparate treatment], the employer need only "articulate some legitimate, nondiscriminatory reason for the employee's [treatment]." 438 U.S. at 577–78, 98 S.Ct. at 2950, *citing McDonnell Douglas Corp. v. Green, supra,* 411 U.S. 792 at 802, 93 S.Ct. 1817 at 1824. "[P]roof of a justification which is reasonably related to the achievement of some legitimate goal [does not] necessarily [end] the inquiry. The plaintiff must be given the opportunity to introduce evidence that the proffered justification is merely a pretext for discrimination." *Furnco Construction Co. v. Waters, supra,* 438 U.S. at 578, 98 S.Ct. at 2950; *McDonnell Douglas Corp. v. Green, supra,* 411 U.S. 792 at 804–05, 93 S.Ct. 1817 at 1825.

In summary, in a disparate treatment case the Title VII plaintiff must show "actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were 'based on a discriminatory criterion illegal under the Act.'" *Furnco Construction Co. v. Waters, supra,* 438 U.S. 576, 98 S.Ct. at 2949, *citing Teamsters v. United States, supra,* 431 U.S. 324 at 358, 97 S.Ct. 1843 at 1866. The Title VII defendant can then rebut the inference of discriminatory intent by articulating a legitimate, nondiscriminatory basis for the challenged action. The plaintiff may then show that the articulated justification is merely a pretext for discrimination. *See, e. g., McDonald v. Santa Fe Trail Transp. Co.,* 427 U.S. 273, 282 & n.10, 96 S.Ct. 2574, 2579 & n.10, 49 L.Ed.2d 493 (1976). The burden of persuasion remains on the plaintiff; the plaintiff must convince the trier of fact by a preponderance of the evidence that the challenged employment practice is discriminatory.

In this Court's recent decision in *Boner v. Board of Commissioners of the Little Rock Municipal Water Works,* No. LR–76–C–7 (E.D.Ark. Mar. 4, 1981) (Memorandum and Order), we discussed the various formula-

tions of a "prima facie" case regarding claims of discriminatory discharge as follows:

The elements of a prima facie case of discriminatory discharge may vary from case to case. In one case, the Court of Appeals for the Eighth Circuit found that the plaintiff had made out a prima facie case of race and sex discrimination where she proved that she was a black woman, that she was fired, and that a white man was hired to take her place. *Teague v. City of St. Louis, Missouri*, 615 F.2d 773, 775 (8th Cir. 1980), *cert. denied*, —— U.S. ——, 101 S.Ct. 271, 66 L.Ed.2d 131 (1980). In another case, the same court found a prima facie case of race discrimination where the plaintiff had proved that he was black, that "he was demonstrably capable of performing his employment duties," that he was discharged, and that "his employer sought people with his qualifications to fill his former job after his discharge." *Osborne v. Cleland*, 620 F.2d 195, 197–98 (8th Cir. 1980). Just recently the Court of Appeals for the Eighth Circuit stated:

In order to establish a prima facie case in a discharge action, [the plaintiff] must show that (1) he belongs to a racial minority; (2) that he was qualified for the job he was performing and satisfied the normal requirements in his work; (3) that he was discharged; and (4) that after his discharge the employer assigned white employees to perform the same work.

*Person v. J. S. Alberici Construction Company*, 640 F.2d 916 at 919 (8th Cir. 1981) (citations omitted).

The Court of Appeals for the Eighth Circuit just recently reiterated that, in determining whether the plaintiff has established a prima facie case, the court is to consider not just the plaintiff's evidence, but all the evidence whether favorable to the plaintiff or not and whether presented by the plaintiff or not. *Underwood v. Jefferson Memorial Hospital*, 639 F.2d 455 at 456 (8th Cir. 1981). Even more recently, in *Johnson v. Bunny Bread Company*, 646 F.2d 1250, at 1253 (8th

Cir. 1981) (citation omitted), the court stated:

To establish a prima facie case of discriminatory discharge in the present circumstances, each appellant must show that (1) he was a member of a protected class, (2) he was capable of performing the job, and (3) he was discharged from the job.

This Court does not perceive any relevant uniqueness in the so-called "present circumstances" of the *Bunny Bread* case. The significance of these various articulations of the standard for making out a prima facie case of discriminatory discharge is that, in each case, the plaintiff must show that he or she is a member of a protected class, that he or she was discharged and that some other factor existed which tends to negate the supposition that the discharge was for some nondiscriminatory reason.

As stated in *Boner*, the presentation of evidence may not lend itself readily to the analytical framework described above for assessing the "prima facie" case requirement. The plaintiff may, as here, call some or all of the defendant's witnesses as part of his case in chief. As a result, much of the defendant's case is brought out by the plaintiff. So in the courtroom, linear evidentiary procedures may simply not obtain. Nevertheless, it is possible to sort out the evidence and to apply the analytical framework to that evidence.

Although the plaintiff, as stated above, relies principally upon evidence he contends shows disparate treatment, he nevertheless attempts to buttress that evidence with statistical data which he believes also shows a disparate impact in Camelot discharge cases. It will therefore be necessary to discuss the statistical evidence and also the evidence relating to the specific cases of alleged discrimination relied upon by the plaintiff.

### B. *Findings of Fact*

The evidence adduced at the trial on the merits tended to reinforce the factual findings and legal opinions expressed in the

Court's opinion of March 27, 1980, on the class certification issue. Those factual findings which are pertinent to any of the merits issues are adopted and reaffirmed hereby. However, if there is any inconsistency between those factual findings and the ones expressed herein with respect to any merits issue, the latter will control.

It was agreed by the parties, and approved by the Court, that it would not be necessary at the hearing on the merits to reintroduce any evidence or repeat any testimony which had been received at the certification hearing. The Court agreed to consider so much of such testimony and evidence as might be pertinent and relevant to any merits issue.

1. *Statistical Evidence*

At the certification hearing the plaintiffs, although given an opportunity to do so, did not put on an expert witness to make a statistical analysis of certain documentary evidence, particularly the E.E.O. reports. *See* Memorandum and Order of March 27, 1980, p. 14 n.13. At the hearing on the merits, the plaintiffs utilized Mr. John Fluker to analyze the document referred to as "Appendix I" (received as Plaintiff's Exhibit 21) and the statistical conclusions contained therein. Mr. Fluker, however, had nothing to do with the preparation of Appendix I. He was first contacted by the plaintiffs approximately a month before the trial on the merits. Appendix I had already been prepared and the samples contained therein selected according to decisions made by others. Mr. Fluker did not give advice on the taking of the pertinent samples. He admitted on cross-examination that samples, if they are to form a predicate for valid statistical conclusions, must be obtained through accepted random selection procedures. In this connection, he stated that if it is decided to take every 20th name or every fifth name from a list, the starting point should be selected in a manner which would insure that each of the first 20 names or each of the first five names, as the case might be, would have an equal chance of being selected as the starting point. This,

however, was not done in drawing the sample in Table I.

Mr. Fluker further admitted that samples were drawn from lists that included voluntary "quits" and involuntary terminations. Furthermore, in his analysis he combined the salaried and hourly employees. He did not make a separate analysis of salaried employees because he was not asked to do so.

Mr. Fluker recognized that the definition of "salaried employees" in Appendix I differed from that in the E.E.O. reports. The result was that some service workers, who were salaried, were not included. Of course, Mr. Fluker had nothing to do with the definition used by the plaintiffs in Table 1 of Appendix I. This difference in definition makes a substantial difference in the results obtained.

In analyzing Table 2 of Appendix I, Mr. Fluker drew certain conclusions, again based upon the supposed accuracy of Table 1. He admitted that the inaccuracies of Table 1 would affect the accuracy of Table 2. Mr. Fluker also recognized that no effort was made to identify the relevant labor market with respect to the many different jobs at the Camelot Inn. He conceded that where a job required special qualifications it would be necessary to identify the pool of blacks possessing such qualifications. Without such data the employment "numbers" with respect to that job could have little significance. Mr. Fluker also admitted that he did not include the "unknown" category in his calculations concerning promotions.

The defendant used Dr. Lynn Roy LaMotte to review Appendix I and the conclusions drawn therein and also to review the conclusions drawn by Mr. Fluker. Dr. LaMotte's credentials are impressive. His testimony, which the Court credits, thoroughly undermines and impeaches the statistical inferences and conclusions of the plaintiff, as set forth in Appendix I and as testified to by Mr. Fluker.

Dr. LaMotte stated that there were inaccuracies in Table 1 and that no meaningful statistical inferences could be drawn from

it. Even had there been no inaccuracies in that table, he was of the opinion that no meaningful statistical inference could be drawn because the information was not compiled from the appropriate "universes." Because of the plaintiffs' inadequate definition of "salaried" employee, he concluded that it would be inappropriate to compare salaried and hourly employees. With respect to the conclusions drawn on page 2 of Appendix I, he testified that to be meaningful the percentages must be related to the availability of qualified persons in the work force. An acceptable percentage representation should then depend upon the availability of blacks in the relevant labor market. With respect to Table 2, Dr. LaMotte testified that the data contained therein does not result from any sampling procedure, and therefore no statistical inference is possible.

Dr. LaMotte concluded that the plaintiffs' theory that the statistical analysis implied "one-for-one hiring" was erroneous. His opinion was that there was simply no data which shed any light on whether there had been one-for-one hiring. Such conclusions could only be drawn if there were available direct evidence relating to the *sequence* of replacements of employees.[3]

Dr. LaMotte emphasized the deficiencies in the sampling procedures and pointed out that it is absolutely essential that the starting point for such a sampling technique be chosen on a random basis. Representativeness can be determined only in the way that a sample is drawn. Checking a sample already improperly drawn against certain known characteristics cannot have the effect of verifying that the sample is representative.

With respect to the analysis made on page 5 of Appendix I, Dr. LaMotte stated that the wrong comparisons were made, rendering the utilization of the Chi square approach inappropriate in this case. Considering hourly employees only, the objective would be to compare the number of blacks discharged and laid off (and also the whites and the unknowns) to their appropriate percentages in the population of inactive hourly employees. But that is not what is in fact compared. Here the numbers of black, white and unknown (3, 31 and 3, respectively) are compared with the proportions of whites, blacks and unknowns in the sample itself.

With respect to the "promotion" discussion at the bottom of page 5 of Appendix I, Dr. LaMotte stated the same problems exist: poor or ambiguous definitions; errors in computations; number of representatives in sample; exclusion of large percentages of the population; and the presence of a large number of unclassified persons. The plaintiffs' analysis purported to show a large disparity between hourly and salaried employees, but again there is no reference to the relevant labor market. Furthermore, the comparisons are simply of numbers within the sample itself. Dr. LaMotte testified that it would be inappropriate to compare promotion rates in job categories at different levels of qualifications because one would not be dealing with one homogeneous group.

Without further detailing the testimony of the expert witnesses, the Court concludes that the statistical inferences drawn by the plaintiffs in Appendix I and by Mr. Fluker

---

**3.** The Court finds from the evidence that the defendant does not follow, and has not followed, a practice of "one for one" hiring, *i. e.*, replacing each terminated (voluntarily or involuntarily) employee with someone of the same race. Plaintiff's position is also inconsistent with this theory. He states in Appendix I (Plaintiff's Exhibit 21) that the defendant started out in 1973 "with an all white cast of 'front office' personnel," but concedes, even using its own definitions, that over 12% of the front office were black on a weighted average basis from 1976 until 1980. (And plaintiff has equat-

ed "salaried" with "front office," a position not substantiated by the evidence.) Furthermore, his percentages for black "salaried" vary considerably from year to year: 1976—31%; 1977—8.2%; 1978—17.2%; and 1979—9.7%. And the plaintiff's figures for hourly black employees vary similarly from a low of 13.7% in 1975 up to 75.6% in 1977 and back to 67.3% in 1979. These figures are completely inconsistent with "one for one" hiring and further support the Court's finding that there was no such policy or practice at the Camelot.

are impeached and do not reinforce any evidence of specific incidents of alleged disparate treatment brought forward by the plaintiffs. However, as stated in the Court's opinion of March 27, 1980, in this case, the information contained in the basic E.E.O. reports and, indeed, the "whole universe" figures contained in Tables 1 and 2 of Appendix I are still available to the Court for comparison purposes and do not require any statistical inferences or expert opinion in order to be considered. It is the Court's view that such basic evidence does lend some factual support to plaintiff's theory of racially discriminatory terminations or at least to plaintiff's theory that defendant's termination policies impact more severely upon blacks. However, such "numbers" would not be adequate, in and of themselves, to establish even a prima facie case for the allegedly discriminatory terminations. Nor would such evidence provide any significant support for Mr. McCarther's individual "promotion" claim. Furthermore, such numbers have been explained as reflecting the natural business situation existing at the Camelot. *See* Memorandum and Order of March 27, 1980. We must therefore turn to an analysis of the evidence relating to the specific cases of alleged discrimination relied upon by the plaintiff.

## 2. *Individual Claims of Discriminatory Discharge*

(a) *James McCarther.* Mr. McCarther learned of a purchasing clerk job opening at the Camelot from the Employment Security Division. He went to the Camelot where he was directed to see Mr. Don Hollis, who was head of the purchasing department. Hollis, who is white, liked him and hired him as purchasing clerk in June, 1974. Mr. Hollis supervised Mr. McCarther and gave him on-the-job training with respect to his duties and responsibilities.

Mr. McCarther claims that he learned of three vacancies in the accounting department around December, 1974, and that he talked to Mr. Tony Supinski, who was comptroller and head of that department,

about his interest in such positions. He filed no formal application for any job in the accounting department, but states that he did not think this was necessary since he was already working at the Camelot. Mr. McCarther claims that Mr. Supinski said that he would get back in touch with him but that he did not. Mr. McCarther believes, but did not prove, that all three positions in the accounting department were filled by whites brought in from the outside.

Mr. Supinski, who is white, was fired by Mr. Lou Richards, the general manager, in April, 1975, because he did not keep his records up to date and was not, in Mr. Richards' opinion, a good comptroller. Mr. Supinski was not produced by either party as a witness. It is clear that, if he knew of Mr. McCarther's interest in any job in the accounting department, he did not convey that information to Mr. Lou Richards.

In his rebuttal testimony Mr. McCarther states that he expressed an interest in the accounting job because Mr. Hollis had told him he had gone as high as "they" were going to let him go in the purchasing department. The Court does not credit this testimony. The evidence is clear that Mr. McCarther was doing well in the purchasing department at the time and was well regarded by Mr. Hollis and Mr. Richards. The Court finds that Mr. McCarther made no serious effort to transfer to the accounting department. There was no showing that any of the accounting vacancies were as good as the job he held. He did not establish a prima facie case.

Sometime around May of 1975, Mr. Don Hollis, after coming back from a vacation, gave notice that he was going to quit his job and move back to Iowa. During Mr. Hollis' two weeks vacation, Mr. Hollis had placed Mr. McCarther in charge of the purchasing department. It was on the basis of Mr. McCarther's actual performance as acting head of the department that it was decided that he would *not* be promoted to succeed Mr. Hollis. Mr. Richards determined from the bi-monthly inventory that there was a shortage of approximately

$1,700 in the storeroom accounts during Mr. McCarther's two week tenure; that Mr. McCarther was frequently away from his post and did not keep the storeroom locked; and that Mr. McCarther did not adequately control the purchases required by the hotel operation. Mr. Richards discussed the question of promoting Mr. McCarther with Mr. Smithers, the Food and Beverage Manager, and Mr. Hollis. He also discussed Mr. McCarther's performance with him personally and pointed out his deficiencies. A decision was then made to select Mr. Dan Hazel, who was working on the front desk, to succeed Mr. Hollis as head of the purchasing department. Mr. Hollis remained at the hotel for a short time after his vacation and helped train Mr. Hazel in his duties and responsibilities. Although Mr. McCarther had not requested to be promoted purchasing manager before Mr. Hazel's appointment, he clearly felt he should have been considered for that position. He inquired of Mr. Richards after Hazel's appointment as to the reasons he was not promoted. Mr. Richards advised him that it was because of his poor performance and attitude during the two week period when he was in charge of the department. He further told Mr. McCarther that he was not adequately qualified and that his actions during the two week period did not evidence, in his opinion, any real desire for the job. Upon this occasion Mr. McCarther did not indicate any interest in any other position at the Camelot.

After Mr. Hazel took charge of the department, Mr. McCarther's attitude turned sour. It is clear from the evidence that he was dissatisfied over not having been promoted and resented Mr. Hazel's appointment. Mr. Hazel conferred with Mr. Richards several times about Mr. McCarther's attitude and indicated that he was having great difficulty working with him. Mr. Richards asked Mr. Hazel if he had discussed the matter with Mr. McCarther and had warned him about his performance. Mr. Hazel did talk to Mr. McCarther about the problem, but there was no improvement. He finally advised Mr. Richards that he felt he should discharge McCarther. Mr.

Richards, in line with his usual attitude of supporting his subordinate managers, okayed Hazel's decision to discharge McCarther. Mr. Hazel advised Mr. McCarther of his termination. Mr. McCarther did not come back to discuss the matter with Mr. Richards thereafter.

Mr. McCarther contends that he was discriminated against in not being promoted to manager of the purchasing department. He claims to have had better qualifications and more experience than Mr. Hazel who was in fact chosen to be purchasing manager. Mr. McCarther's application shows that he had three and one-half years of college and that from 1972 until 1974 he had been employed as a material handler by F.M.C., and for five months in 1974 as porter with the Memorial Hospital in North Little Rock. In his testimony at the trial he detailed a great deal more concerning his experience, some before coming to Camelot, some after. The comparative qualifications of Mr. McCarther on the one hand and of Mr. Hazel on the other are not too important in this case because Mr. McCarther was not denied promotion because of any lack of qualifications. Indeed, he was given the responsibilities of the purchasing manager during Mr. Hollis' vacation. The reason Mr. McCarther was not promoted was, as indicated above, his *inadequate performance* during that two week period.

Mr. Dan Hazel was hired as a desk clerk at the Camelot on April 9, 1975. He states that he went to the Employment Security Division office and then directly to the Camelot. He was told that there was a need for someone on the front desk. He filled out an application and was hired. Mr. Hazel had completed two years of college and had had experience in the management of three small resort hotels at Greers Ferry, Arkansas. He had served as the night manager for the Narrows Motel and did the maintenance for the three hotels. He was one of three people who were in charge of the properties, and he had general experience in cooking, maintenance, and purchasing in that context. After he had worked at the Camelot for approximately two

months, Mr. Richards, the manager, asked if he might be interested in the purchasing manager job. This inquiry was made after the decision was reached not to promote Mr. McCarther. Mr. Richards explained the duties and responsibilities of that job to Mr. Hazel. Mr. Hazel stated that he was interested. Apparently Mr. Richards and Mr. Smithers then conferred about the matter, and Mr. Hazel was given the job.

Mr. Hazel's background is of some importance in the context of the issues in this case. While a very young man, he evidenced strong idealistic concerns. He was a member of a humanitarian organization called "Metamorphosis" based in St. Louis, and later a member of "Group, Inc.," essentially a cooperative living and working arrangement. The Court credits Mr. Hazel's testimony that he had, and has, a concern for the problems of black people and that he worked for racial equality. Blacks lived in his home when he was growing up.

When Mr. Hazel came on the job, he found Mr. James McCarther to be irresponsible and uncooperative. Mr. McCarther would not come to work on time. He frequently was not in the storeroom when required to be. It was important in the operation of the department that someone be present in the storeroom at all times. A perpetual inventory was maintained and records of all requisitions and acquisitions had to be made. Apparently at about this time Mr. McCarther had a second job at a nightclub. He would, according to Mr. Hazel, come in sleepy or with a hangover. On one occasion he went to sleep at the desk and Mr. Hazel could not awaken him. At that time Mr. Hazel found that the door to the storeroom had been left unlocked. On that occasion Mr. Hazel locked the door and "clocked" Mr. McCarther out so that he would not receive pay for the four hours that he slept. That particular occasion was on a Saturday morning. When Mr. McCarther returned on Monday, he was very upset with Mr. Hazel for having clocked him out, and he also resented Mr. Hazel's criticism of his work performance.

Mr. Hazel received complaints concerning Mr. McCarther's work from the kitchen, from salesmen who felt he had treated them rudely, and from the front desk where it was reported he was receiving too many personal telephone calls. There was only one telephone in the purchasing office.

It was after the "sleeping" incident that Mr. Hazel took the problem up with Mr. Richards. He told Mr. Richards that he was having a continuous problem with Mr. McCarther and felt it might be necessary to discharge him. Mr. Richards inquired if he had warned Mr. McCarther.

Mr. Hazel discussed the problems with Mr. McCarther again and told him that because of the complaints and difficulties Mr. McCarther would have to do his job or be terminated. According to Mr. Hazel, Mr. McCarther's first response was good. He indicated he was going to cooperate. However, there was no improvement. Mr. McCarther was terminated on July 29, 1975, and a termination report was submitted by Mr. Hazel. Mr. McCarther's attitude indicated that he more or less expected the action. He stated, "Okay. That's it."

On August 6, 1975, apparently in response to an EEOC charge filed by Mr. McCarther, Mr. Hazel wrote a memorandum to Mr. Richards explaining James McCarther's termination. The Court finds that there was a factual basis for each of the "liabilities" of Mr. McCarther referred to in that memorandum. The reasons for Mr. McCarther's termination were not pretexts to cover some race-related motivation.

Mr. Dan Hazel left his employment at the Camelot some time ago. At the time of the trial, he was the assistant manager and resident manager of the Sheraton Hotel in Little Rock.

It is clear to the Court that Mr. McCarther started out as a good employee in the purchasing department. It is equally clear that his resentment over his failure to receive the promotion to purchasing manager manifested itself in his attitude towards his "new boss," Mr. Hazel. The Court finds that there was a valid basis for Mr. McCarther's discharge and that neither that

discharge nor Mr. McCarther's failure to receive the promotion were in any way motivated by racial considerations. The Court therefore concludes that his personal action must be dismissed.

(b) *Ms. Doretha Summerville*. Ms. Summerville made a good impression on the Court. Her testimony was direct and forthright. Ms. Summerville started at the Camelot as supervisor of housekeeping and then was promoted to supervisor of the laundry. She appears to have been a good worker.

Ms. Summerville claims that one afternoon around 2:30 p. m. she had a call that her baby was sick and, therefore, she went home. About 4:30 p. m. she called back to speak to Ms. Adams, her supervisor, and advised her that the doctor prescribed that her baby be given medicine and that she did not think she would be back to work the next day. She stated that Ms. Adams said, "Okay," and that she could be off. She did not return to work the following day. Sometime that day Ms. Adams called and told her that if she could not come to work she would have to replace her. Ms. Summerville testified that apparently Ms. Adams' boss was "on" her, and she believes Ms. Adams was simply taking it out on her. The next day Ms. Summerville returned to work. Her working hours were from 7:00 a. m. until 4:30 p. m. She did not see Ms. Adams until around 9:00 a. m., at which time Ms. Adams said nothing. Later in the day Ms. Adams got "on my back" because of lint in the top of the dryer. She said Ms. Summerville was "letting things go down" and complained that the pilot light was not working properly. She said nothing about Ms. Summerville's previous absence. Then she repeated that she was going to have to replace Ms. Summerville. Ms. Summerville then went to Mr. Lou Richards, the manager, and told him that she could not please Ms. Adams and that she could not be both a "maintenance man" and the supervisor of the laundry. Mr. Richards' response was that Ms. Summerville would have to learn to get along with Ms. Adams, her supervisor, and to "do it her way." Ms. Summerville's response, in turn, was to quit the job.

Mr. Richards asked if she wanted her pay. She replied, "Yes," was paid, and left. Despite Ms. Summerville's dissatisfaction with her working conditions and with the attitude of Ms. Adams, it is clear that she was not fired. The Court notes that Mr. Richards took a rather strong position of backing up his department heads. But there is no evidence, or inference, of any racial motivation in this incident. It should be mentioned that Ms. Summerville was replaced by another black employee.

(c) *Ms. Flossie Brunson Bogard*. This witness worked at the Camelot as executive housekeeper until April, 1974. It is not clear when she started work there, but the evidence indicates that the hotel opened in June, 1973 and that at least one other person preceded Ms. Bogard as executive housekeeper. As the executive housekeeper, she earned close to $700 per month. Her boss was John Charles, the then hotel manager, who was new at that position. Her job was to supervise, hire, train, and fire the maids. Some 25 persons worked under her, one of whom was white.

If a maid was off without cause or did not call in, she would fire her in accordance with her superior's standards and instructions. She states that if she called an absent maid and she did not come in, then she would fire her when she did come back. She states there was no published rule in this regard, but that that was the policy. She testified she followed this policy although she did not agree with it.

She claims that she was fired for no known reason. She was told that another supervisor would be coming in from Texas to take over. She further states that she had no advance notice.

Mr. Lou Richards became manager of the Camelot on August 9, 1974. He testified that he had no information about Ms. Bogard's situation. (According to her testimony, Ms. Bogard left the Camelot before Mr. Richards arrived on the scene.)

The evidence indicates that the Camelot experienced considerable trouble during its "starting up" period. Apparently there

were some four or five managers, or acting managers, between June, 1973, and August, 1974, when Mr. Richards arrived. He then remained until December 31, 1977. Mr. Richards does recall that a Ms. Georgia Adams, a white woman, was housekeeper when he became manager. She came from the Holiday Inn Downtown in Little Rock, and remained at the Camelot until the end of 1976, when her husband died.

There is just no good explanation of the defendant's decision to replace Ms. Bogard. It appears clear that she was an excellent employee. There is some suggestion that she was the victim of the confusion surrounding the original staffing of the hotel. There is no direct evidence that she was terminated because of any reason related to race. On the other hand, her termination has not been explained by the defendant, and it appears that she was replaced by a white person. Her termination, then, would tend to support the prima facie showing required of plaintiffs in Title VII cases. The defendant has come forward with such evidence as it could, but has produced no records or witnesses to reveal the circumstances of this 1974 incident.

(d) *Robert Stancel.* This witness worked at the Camelot as a breakfast cook for a short period during the summer of 1974 or 1975. His hours were from 5:00 a. m. to 1:00 p. m. He was terminated or laid off, but he does not know why. He states that a new chef, "Mac", called a meeting shortly after his arrival on the scene and, after the meeting, told him that he did good work but that "we don't need you any more." Mr. Stancel went to the office where he was given his check. He tried to talk to Mr. Lou Richards, but was unable to do so. Mr. Richards did not remember Mr. Stancel, although he remembered when Mr. Joe "Mac" McCracken came to Camelot as a chef. He also was certain that "Mac" did not bring any new cooks with him when he joined the hotel.

"Mac" was white. Stancel does not know who, if anyone, replaced him, but he heard that "Mac" had someone he wanted to place in the job. There was, however, no compe-

tent evidence that this was so. Mr. Stancel never returned to the Camelot after he was laid off or terminated.

Another man by the name of Herman also worked there as a breakfast cook. He had seniority over Mr. Stancel. He was also black and apparently remained at the Camelot after Mr. Stancel left.

This case is somewhat like that of Ms. Bogard, *supra.* Although the defendant's evidence suggests that Stancel was simply laid off (and not fired), the fact is that the evidence simply does not explain what actually occurred in this situation. In this case there is no competent evidence that Mr. Stancel was replaced by a white, or, indeed, that he was replaced at all. Mr. Stancel's own testimony does not suggest a racial basis.

The Court's comments with respect to the Ms. Bogard incident, *supra,* apply here. The two situations will be further discussed *infra.*

(e) *Billy Ray Hayes* worked at the Camelot in 1974. He progressed from janitorial service to dishwasher to steak cook to assistant chief steward. He believes he was fired in February, 1975. Other evidence indicates that this actually occurred in June, 1975.

He claims that he was injured, was sent to the doctor, and was then off five days. When he reported back for work, he states he was told that he was terminated. He tried to find out why, but was unable to get by the secretary. He believes he was fired because he refused to fire a subordinate who refused to help clean up the kitchen after the dishwashing machine broke down. He states that was unfair because it was not part of the subordinate's duties to do such work.

The witness claims he was not terminated for failing to show up for work.

The witness admits that the injury was to his kneecap rather than to his back, as was first testified. He believes he was injured while he was assistant chief steward, not "dishwasher" per defendant's Exhibit 17.

Mr. Richards, the manager at the time Mr. Hayes was terminated, did not recall Mr. Hayes or the incident. Mr. Hayes' recollection of the facts, dates and events was not too good, but, here again, we do not have a clearcut explanation by management as to its reasons for discharging Mr. Hayes. There was no evidence that he was replaced by a white. The circumstantial evidence suggests the contrary.

The Court finds no basis for inferring any racial motivation in connection with this incident. Mr. Hayes' own opinion was that he was fired for insubordination in refusing to discharge a subordinate who would not help clean up the kitchen after the dishwashing machine broke down. Mr. Billy Ray Hayes' "case" has to be considered in connection with the testimony of his mother, Mrs. Mamie Hayes, and of Mr. Willie Johnson. *See infra.*

(f) *Mamie Hayes.* This witness is the mother of Billy Ray Hayes and the aunt of the *next* witness, Willie Johnson. She states she started to work at Camelot after Christmas in 1974–75. She was a dishwasher. She was involved in the incident concerning the cleaning up of the kitchen when the dishwasher broke down. She states there was water all over the floor and that her boss, Minzo Wilkins, a black, ordered her and her daughter and the other dishwashers to clean up the kitchen. She apparently refused because the work, with a 15 lb. mop, was too hard. Apparently quite a few employees lost their jobs as a result of this incident. She admits she refused to obey her boss' orders, and also admits that when the dishwasher broke down, there was no other work for the dishwashers to do.

Mrs. Hayes was a creditable witness. However, her testimony clearly indicates that she was discharged for simple insubordination. There is no indication that any of the persons discharged as a result of the incident were replaced by whites. The Court finds no racial motivation to be involved.

(g) *Willie Johnson.* Mr. Johnson, the nephew of Mamie Hayes, was involved in the same episode as Mrs. Hayes. He states he was told he was fired, but did not know the reason. He states he worked for three or four months. Apparently Wilkins (a black) fired him. He admits he was involved in refusal to mop up, but says that he did then obey the order and did mop up. He also states that he was not fired until two weeks after the incident. He admits that he may have missed a day or two of work. He does not know who replaced him.

Although the evidence indicates that Mr. Willie Johnson may have been fired for insubordination in connection with the "mopping up" incident or because he was absent from work, the defendant did not bring forward any direct evidence explaining the termination. Nevertheless, there is nothing in Mr. Johnson's testimony to directly suggest that he was fired because of racial considerations. Whether Mr. Johnson's testimony helped to establish a prima facie case, and, if so, the effect of the defendant's failure to bring forward a specific explanation of the incident, all in the light of the overall evidence of the defendant's practices and policies, are issues which will be discussed *infra,* along with the situations involving Ms. Bogard and Mr. Stancel. *See supra.*

(h) *Alvin Nelson.* Mr. Nelson started as a dishwasher and then was promoted to porter. He also served as a banquet waiter on special assignments. His employment with Camelot began on November 11, 1974, and ended in March, 1975. He states he was fired, but cannot understand why. He never had any problems and got along with everyone.

On the day he was terminated, his boss, Mr. Smithers, stated he would like to see him and then told him that they would no longer need him. Mr. Nelson asked why, but Mr. Smithers walked away. He then went to the personnel office and inquired as to the reason for his termination and was told that it was because he was throwing away the empty liquor bottles. Mr. Nelson admits he was throwing away the empty liquor bottles, but states that no one ever told him that he should not throw them away.

Mr. Nelson served over three years in the U. S. Army. He states he was never fired before.

Mr. Nelson states that he was originally hired by the cook.

Mr. Nelson denies that he was criticized for not working when he was supposed to, or for not completing his work on time.

The defendant introduced defendant's Exhibit 64 which contains two termination reports and the file on Mr. Nelson's employment insurance claim. The determination by the Claims Examiner was, "You were discharged for not working as scheduled and for throwing away bottles before they were counted in the inventory." The Appeals referee found that Mr. Nelson was discharged "because he was, in his employer's opinion, an unsatisfactory worker."

The Court was impressed with Mr. Nelson and his straight-forward testimony, but is convinced that he was discharged for failure to keep a proper inventory of liquor bottles. This was unfair because Mr. Nelson had never been properly instructed on an inventory procedure. Nevertheless, the Court is convinced that Mr. Nelson's termination had nothing to do with racial considerations.

(i) *Julius Lewis*. Mr. Lewis was the maitre d' at the Camelot from May 8, 1975 until June 18, 1977. He had the authority to hire and fire employees in the dining room and, in general, supervised approximately four waiters and three busboys. Mr. Lewis started out under the supervision of Mr. John Smithers. At the time of his termination, his supervisor was Mr. John Thurman, who became Food and Beverage Manager when Mr. Jim St. John was transferred to the Tulsa Camelot operation.

From all that appears, Mr. Lewis got along well until the latter part of 1976. Indeed, the serious problems did not arise until Mr. Thurman became his supervisor.

At about that time, or shortly before, Mr. Thurman was promoted to the position of Food and Beverage Manager, the hotel management decided that a big "push" should be, and would be, made to get the dining room operation "off the ground." It was decided to make many changes in the dining room operation. An entirely new menu was created. Promotional ads were placed with the local television stations. The whole idea was to make the dining room a more popular, profitable, and efficient operation.

Everyone who testified agreed that Mr. Lewis was an excellent waiter. But there were complaints that he was not a good manager. The first negative attitudes were noted by Mr. Lewis when he refused to fire a waiter, Mr. E. Jackson, who management felt was too slow and was unable to adequately serve the proper number of tables. Mr. Lewis felt that the request was unreasonable and unfair. Therefore, Mr. Thurman, himself, had to make the decision to replace Mr. Jackson. Mr. Lewis felt from that point forward, that Mr. Thurman was constantly "bugging" him. His hours were changed and he was criticized about the cleanliness of the dining room and such things as the failure of the busboys to get haircuts. Finally, when it was about time for him to go on his vacation, Mr. Thurman fired him, giving him two weeks additional pay. Mr. Lewis inquired as to the reason but, according to his testimony, was only told that, "You are always late." Mr. Lewis denied this. He believed that the management may have suspected that he was having an "affair" with a white lady, but the Court credits Mr. Thurman's testimony that he was not even aware of any such situation or any such allegation. Nor was Mr. Richards.

On Mr. Lewis' termination report (defendant's Exhibit 32), four reasons were given by Mr. Thurman:

1. Coming to work late;

2. Having liquor on breath;

3. Dining room not ready to open on time;

4. Dining room has not improved.

Although the defendant offered some proof with respect to each of the items referred to by Mr. Thurman, the Court believes that the last reason listed was the major reason for the discharge.

It is the Court's view of this incident that Mr. Julius Lewis was the victim of the concerted efforts of the management and of Mr. Thurman to upgrade and improve the dining room operation so that it would be more profitable. In the process, great pressures were brought to bear upon Mr. Lewis. It is clear that Mr. Lewis was, and is, a kindhearted person who did not relish making the changes or the tough management decisions that Mr. Thurman felt were called for under the circumstances.

After Mr. Lewis was fired, he was not immediately replaced. The Court finds that Mr. Thurman's first choice for his replacement was a black waiter at the Little Rock Country Club, who at first accepted, and then turned down, the job. Then it was decided to change the entire philosophy of the operation. Rather than have the dining room managed by a maitre d' who presided over the waiters and the serving of food wearing the traditional dinner jacket, a dining room manager would be employed. Since Mr. Lewis' departure, the Camelot has had no maitre d'. The manager ultimately selected was a white man who was brought in from the Tulsa Camelot operation.

It is clear that the decision to fire Mr. Lewis was made by Mr. Thurman. When Mr. Lewis asked Mr. Richards why he was fired, Mr. Richards stated that he felt Lewis was doing a good job. He was then asked why he was firing Lewis, and Richards responded, "I am not firing you; Thurman is firing you." Here again is an example of the decentralized hiring and firing authority found at the Camelot. It also represents one more example of Mr. Richards' philosophy of backing up his subordinate managers.

Although the Court does not credit many of the "reasons" given by the defendant for the termination of Mr. Lewis, it is convinced that that termination was predicated upon Mr. Thurman's perception, whether accurate or not, that Mr. Lewis was not a good manager and could not improve the profitability of the dining room. It does not appear that that termination was in any way motivated by racial considerations.

(j) *Robert Webb.* At the time of the trial Mr. Webb was the dining room manager at the Sheraton Motor Inn. He had been hired there as a waiter in 1977 and was later promoted to that position.

Mr. Webb first came to Camelot in August, 1975. He was hired as a stock clerk in the purchasing department under Dan Hazel. The hotel manager at the time was Mr. Lou Richards. Hazel then resigned and was replaced by Ed Pratt who, according to Webb, did not have much experience in the area but was "very smart." Webb acted as stock clerk and Ed Pratt's assistant. Then Pratt quit and a Mr. Forbis was brought in. Webb claims that he was overlooked for this promotion at that time, but he did not complain. Forbis, according to Webb, had been a service station attendant, with no experience in purchasing. Forbis, a white man, was unable to do the job and was fired.

When Forbis left, Webb asked for the job of purchasing manager. He was given the job at the suggestion of Mr. Richards. Mr. Webb believes he held the position for five or six months.

Apparently Mr. Webb's work was not satisfactory to Mr. Lou Richards or to Webb's immediate supervisor. His shortcomings were discussed with him by Richards on perhaps a half dozen occasions.

When Webb was preparing to leave for his vacation, Richards told him that during his absence he, Richards, would get into the purchasing office in order to see what procedures were being followed and what was going on. While on vacation Mr. Webb received a letter in effect discharging him. He got vacation and termination pay.

Mr. Richards testified that Robert Webb simply could not handle the job, that he found a complete disparity in the inventory—overbuying in some areas and underbuying in others. He explained the situation in the letter to Webb of June 14, 1976. The Court finds that the reasons given in the letter for Mr. Webb's termination and others testified to by Mr. Richards were the true reasons for that termination.

Richards stated that he felt Robert Webb to be a fine man. He was responsible for his being promoted to the job of purchasing manager in the first place. Later when he was the manager at the Sheraton, Mr. Richards hired Mr. Webb as a waiter and later promoted him to the dining room manager position there.

Mr. Webb claims that he handled the inventory like his predecessors, but does not deny the deficiencies mentioned in the letter to him. This is clearly a "merits" situation without any racial overtones. Rightly or wrongly, Richards believed Webb to be incapable of handling the duties of the particular job of purchasing manager. He was obviously high on him otherwise.

After Mr. Webb's departure, the duties of the purchasing manager were divided between a Mr. Ferguson, a black, and a Mr. Sudduth, a white.

(k) *Orris Smith.* Mr. Smith was hired as a waiter at the Camelot in August, 1973. His immediate supervisor was Mr. Herman Warren. At the time of his termination, Mr. Julius Lewis, the head waiter, was over both of them.

Mr. Smith was terminated as the result of an argument one Sunday morning between Smith, Warren and Lewis. Smith states that he and Warren were talking and Mr. Lewis came up and started arguing with Warren. Then "he started on me," and then "one thing lead to another," and Lewis said, "Well, I'll fire you." There is a dispute as to what happened at this point. Smith states that Lewis then went to Mr. Lou Richards' (the hotel manager) office and when they both came out, Lewis told Richards to fire Smith. The Court finds, however, that Mr. Richards was not involved in the termination of Mr. Smith. The termination was by Mr. Julius Lewis, a black, essentially for insubordination. Mr. Smith does not recall the reasons for the argument or exactly what was said, but he admits that he talked "nasty" to Mr. Lewis, his superior. Mr. Smith did not make a good witness. His memory was bad, and he was not very forthright in his testimony. It is clear that the termination had nothing to do with race.

(*l*) *Earl Haymon.* Mr. Haymon was hired as a "busboy" in February of 1972 or 1973. Later he was promoted to the main dining room and made head busboy. His supervisor was Mr. Smithers. Still later he was promoted to waiter.

Apparently Mr. Haymon has worked at the Camelot several times. He quit on one occasion because he was ordered to pool his tips with the other waiters and the waitress, and he did not wish to do so. John Thurman was his boss at that time. Later John Thurman asked him to come back and he did, in the same job. Apparently everything went well until "Carol", a waitress from the cocktail lounge, was put over the dining area. According to Haymon, she discharged him, stating that she couldn't tolerate the way he supervised others in the dining room. Actually she let him off and told him to come back and talk to Mr. Thurman when he returned from his vacation. He did come back and continued to work until November, 1978, when he was discharged by Mr. Elege for excessive tardiness. Mr. Haymon does not contend that he was not tardy. He contends that others were not treated the same way. Haymon admits that he signed the performance appraisals, Exhibits 22 and 23. He claims that they were sometimes signed in blank, but the Court does not credit this testimony.

This is an interesting case. It shows that Mr. Haymon was rapidly promoted from busboy to waiter. It illustrates the not unusual phenomenon of a worker quitting or being discharged at Camelot and then returning shortly thereafter to work again. This circumstance tends to negative both "personal" and "racial" reasons for such terminations. The Court finds no racial basis for any of the terminations of this witness. The requirement to "split tips" was intended to apply to all of the waiters and waitresses. Mr. Haymon does not really deny his frequent tardiness, although he claims that others were not fired for the same reason. However, there is nothing in the evidence to indicate that the rule was

not applied equally to others, and certainly nothing to indicate that it was applied differently with regard to whites than with regard to blacks. Like many of the other incidents, this case also illustrates the decentralized hiring and firing authority at the Camelot.

(m) *Marvin James, Jr.* At the time of the trial, Mr. James was working at the Sheraton as the banquet manager. He worked for the Camelot early in 1975. Mac McCracken, the chef, first hired him as a dishwasher at the Camelot. He was later promoted to busboy in the dining room, then to room service, and then to waiter. He states that he was frequently complimented for his good work. At one time he was put up for "employee of the month."

James was terminated because of a stealing incident. He claims that it was "guilt by association." He frequently came to work with one Clarence Smith. Apparently Clarence took a bottle of wine or champagne, put it in a laundry cart, and slipped it out to the parking deck while accompanied by James. John Thurman, who was present at the termination interview, testified that Clarence said "they" got the bottle and "*they*" were going out to drink it after work. The security man stated that the bottle was half empty when found. James was told by John Thurman that being with Clarence Smith was just like doing it. He claims that a white lady, "Diane," was caught stealing out of the cash register, but that she was not fired. However, the Court finds that Diane Keeting was fired for voiding food checks while she was a cashier. It is true that she was hired back sometime later as a part-time waitress.

The Court finds that both Mr. John Thurman and Bob Kirsh, who handled the termination of Mr. James, honestly believed that James was involved in the theft based upon both Mr. Clarence Smith's statements and the circumstantial evidence. This was a reasonable belief upon the basis of the evidence. As testified to by Mr. Thurman, "At the time it was my belief that both were equally guilty." The actual guilt or innocence of Mr. James is irrelevant for our purposes. Race was clearly not a factor in this termination.

(n) *Sylvia Ransom.* Ms. Ransom, who had worked at the Camelot off and on since 1975, was rehired in December, 1977, as a dishwasher. Apparently she had a baby in March, 1978. She testified that on March 22 or 23 she came back to the Camelot but was told that she was fired. She states she was given no reason. She states she was injured on the job while pregnant and was off work for a while. She admits that she was offered part-time work, but turned it down. She states she talked to Mr. Richards about her termination. Mr. Richards did not remember the incident, and it is clear that he left the Camelot in December, 1977.

This case, as presented by Ms. Ransom, is so confusing as to be almost meaningless. The defendant's agents have no recollection of the incident, but the company's records state:

> Ms. Ransom resigned 3–27–78 because of complications with her pregnancy. She was told she could come back to work for Camelot if she wished (Eligible for Rehire). She returned, worked one day and resigned because of dissatisfaction with her job.

This notation is dated May 5, 1978, and shows "last day worked" as May 2, 1978. The employee separation form dated March 27, 1978, shows her as a "voluntary quit" because of "pregnancy with complication." The termination report, also of March 27, 1978, shows "resigned" with the reason being "Pregnant. Needs to be off."

The Court accepts the explanation contained in the company's records. Race was not a factor in her termination, which was, in fact, voluntary.

(o) *Ruth Ann Wilson.* Ms. Wilson claims she worked as a dishwasher for three or four months in early 1975. Her supervisor was a black man named Joe Smith. She had difficulties with him. She states he would drink and sexually harass her and the other two female dishwashers. When she refused to be the sole dishwasher as scheduled, Joe told her that if she couldn't

do what he said she should go home. Joe reported that Smithers said that they, the women, were to do the job as Joe said or be sent home. She stated that she was not accusing Richards of condoning Joe's actions or telling them to submit to his advances. And she did not know exactly what Smithers meant if he in fact had the conversation Joe referred to. The Court does not find Ms. Wilson's testimony to be probative of any claim of racial discrimination. Richards has no recollection of the complaint. Neither does Mr. Smithers.

(p) *Billy Ray Howard* worked at the Camelot for a while. Then he went to Oregon for about six months. Upon his return, he was rehired, worked for about four months, and then left. He does not recall the reason for his termination. Apparently, he thought he would be going into room service when he was rehired, but that single job was then already held by a white employee. He admits he was reprimanded for absence and tardiness, and admits he was in fact tardy and possibly absent.

There seems to be no racial basis to this claim, if indeed a claim is really being asserted. Mr. Howard apparently was terminated under a tardiness policy of which he was fully aware.

It appears that prior to 1977 there were no written rules about absences and tardiness. However, department heads were instructed to warn on the first unexcused absence and fire if there were a second. The new written policy required warning and termination if the problem reoccurred within two months. The Court credits Mr. Richards' testimony that the Camelot Inn needed employees and was not seeking excuses to fire them. However, punctuality and attendance were considered essential in the operation of the Inn.

(q) *Richard Smith.* When the Camelot opened, Mr. Smith went to work there as a co-bell captain with Fred Quick. When management decided to have only one bell captain, Mr. Smith became a bellman.

Mr. Smith is of the opinion that blacks were limited to certain job categories, to wit: waiters, bellmen, maids, bus help, janitors, porters, and maintenance workers. The other evidence, however, demonstrates that this is, and was, not so.

Mr. Smith states that at first, management was not good and there was much absenteeism among the administrative staff. Then John Charles, the president of the company from Tulsa, came to shape things up. He was followed by Lou Richards, who, according to Mr. Smith, "ran a tight ship." Although at first Smith had a fine relationship with Richards, he later came to believe that he was racist. The Court finds no basis, however, for this allegation or belief. Smith also claims he had a brief discussion with Richards about a promotion to a public relations position. Mr. Richards denied any such discussion. In any event, the Court finds that Mr. Smith made no serious effort in this regard and, further, liked his job as bellman and did not seek another.

Mr. Smith mentioned a problem that occurred in connection with a group of entertainers who appeared in the lounge. Mr. Smith drank with them. According to him, Mr. Richards called him in and said the lady in question did not wish to be in his company. Mr. Smith also asserts that at another time a white female, whose name he did not know, borrowed $20 and kissed him on the cheek and that Rex Coulson remarked about it to Richards. Mr. Smith believed he was in trouble from then on. Richards does not recall such a conversation at all, and there is no competent evidence that Coulson made any such remark to him, even assuming the incident actually occurred.

Apparently, as further support of his opinion that Mr. Richards was a racist, Mr. Smith testified that he rented a party room in the hotel for a birthday party and that thereafter Richards circulated a memo forbidding any more parties to be held on the second floor of the hotel by employees. Mr. Smith concedes, however, that black guests are welcome to hold parties at the hotel.

Mr. Smith testified he had heard the "rumors" about prostitution in the hotel and that he was sure there was some. He knew

that Mr. Richards believed it to be a big problem. When he heard Richards suspected him, Smith states that he confronted Richards and was told by Richards that he did not believe that Smith was a major participant. Mr. Smith testified that he thought he was terminated because he was suspected of theft from guests. This, the Court finds, was not the case.

Mr. Smith had known Mr. Quick for 10 or 15 years before taking the job at the Camelot. He and Mr. Quick were hired on the same day. At the time of Mr. Smith's termination, Mr. Quick was his boss, being the bell captain. Mr. Smith stated he did not recollect that Quick discussed procuring with him, but he does recall that Quick told him that Richards did not like his kissing a white girl. The Court does not credit this testimony. It accepts Mr. Quick's testimony that he warned Smith about his participation in procuring and that Mr. Smith was told that that was the basis of his discharge, even though the reason given in writing was "service no longer needed." Furthermore, Mr. Smith admitted that he did on some occasions procure the services of a prostitute for a guest for money, and that he knew Mr. Richards was trying to stop that very thing. Clearly, Mr. Richards' suspicions and guest complaints were not without foundation.

The Court believes that Mr. Quick was following Richards' orders as he understood them. Mr. Richards had already fired Elmo Smith, his white security officer, for his failure to stop prostitution in the hotel. Left to himself, Quick might have ignored the situation. Confronted by the manager with specific complaints and told to do something, he did. He fired Smith after the second complaint. The Court does not believe Smith's testimony that Mr. Quick told him that he and Mr. Clydes Flemings were suspected of stealing or that two white boys were apprehended for stealing the next day. At his deposition, Mr. Smith said he had no idea what the reason for his termination was. The testimony of Mr. Mantooth strongly corroborates that Richard Smith was implicated in prostitution. That, of course, is not the question. The

fact that he communicated this belief to Quick and Elmo Smith, however, is important. It indicates that management did have reason to believe that Smith was involved in a practice it was trying desperately to eradicate. The Court finds that Mr. Smith was terminated because he was believed to be involved in prostitution at the hotel in direct violation of orders. Racial considerations played no role in Mr. Smith's termination.

(r) *Clydes Flemings* was a bellman who was fired, rehired and fired again. He, too, during his first tenure was named by guests in complaints to Richards as being involved in prostitution. After a warning, he was terminated by Quick. Two years later Quick re-employed him, apparently without Richards' knowledge. The morning of the third day after his return to work, Mr. Richards saw him in the coffee shop with a white woman who had been run out of the hotel as a prostitute. He told Quick that he believed that Clydes was up to his old tricks. Quick said he would take care of it, and he fired Flemings again. Given the security report from the night before and that, although not a guest, the lady in question had come down the elevator that morning, Mr. Richards' belief that Mr. Flemings was again involved in forbidden activity was based on that reasonable belief. His discharge was not affected in any way by racial considerations.

3. *Analysis of Individual Cases of Alleged Discriminatory Discharge*

It is important to analyze the facts, as found *supra*, with respect to certain of the individual incidents in order to determine the legal effect thereof.

A. The incidents involving Ms. Flossie Bogard, Mr. Robert Stancel, and Mr. Willie Johnson fall into one category (although Mr. Stancel's and Mr. Johnson's cases are not nearly as strong as Ms. Bogard's). These persons, who are black, state that they were fired for reasons unknown to them. The testimony of none *directly* suggests a racial motive. Indeed, Mr. Johnson

was apparently fired by another black, Mr. Wilkins. Still, the defendant is unable to find any record to explain specifically its reasons for the terminations. Nor can it find any witnesses who know or remember the circumstances surrounding those incidents, which occurred some six or seven years ago.

Were these incidents analyzed as individual claims of racial discrimination, Ms. Bogard would be held to have made out a prima facie case, by showing that she is black, that she was qualified for her job, that she was fired, and that she was replaced by a white. It is less clear whether Mr. Stancel and Mr. Johnson would be held to have made out prima facie cases. Considering all the evidence, the Court doubts that they would be. They have shown that they were black and that they were discharged, but they have not made any clear showing of any other relevant factors. The only evidence on their qualifications and their replacements is circumstantial and indefinite. It is inconclusive on the issue of whether they were qualified for their jobs, and it suggests that they were probably replaced by blacks rather than whites, if, indeed, they were replaced at all. Nevertheless, in all three of these incidents, the defendant failed to produce any evidence of the reasons for the discharges. In each case, if the alleged discriminatee were a named plaintiff and if a prima facie case were found, the defendant's failure in this regard would require a finding of discrimination with regard to the individual. *See Texas Department of Community Affairs v. Burdine,* —— U.S. ——, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Furnco Construction Corporation v. Waters,* 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978).

The three individuals are not, however, named plaintiffs in the case. It is impossible to say at this juncture whether or not they could have successfully maintained cases for discriminatory discharge if they had filed such cases back in 1974 or 1975 when, assumedly, the information concerning the incidents was available to the defendant. Since they have not pursued relief individually, the Court may not consider the incidents as individual claims for relief, but will consider them, in the context of all the evidence, as they bear on the issue of class-wide discrimination and possible class relief. Isolated cases of unexplained terminations of black employees may help support the initial prima facie case required of plaintiffs in Title VII class action cases but yet may, after a full hearing on the merits, fail to form an adequate basis for a finding of any class-wide *policy* or *practice* of racial discrimination. Such is the situation here. *See infra.*

B. Another category of incidents revealed by the testimony is exemplified by the cases of Billy Ray Hayes and Mamie Hayes. The testimony of these two persons clearly reveals the nonracial, business reason for their terminations. It is true that the defendant had no specific information concerning the terminations. However, in this type of case, the necessary prima facie case is never established because the witness' testimony does not give rise to any inference that the termination was for a racially related reason but, on the contrary, shows that it was for a legitimate business reason. In these two cases, for instance, each employee was fired for simple insubordination.

C. The third category of incidents is typified by the cases of Julius Lewis, Robert Webb, Earl Haymon, Marvin James, Jr., and Sylvia Ransom. In each of these cases, the claimant by his own testimony, or other evidence, establishes a prima facie case. The defendant then puts on evidence tending to establish a non-racial reason for its actions, and the claimant may or may not follow with evidence tending to prove that the defendant's stated non-racial reason is really pretextual.

Of course, some incidents may not fall easily into any one of the three categories mentioned. Sometimes a claimant's testimony on direct examination will tend to establish a prima facie case, but that case will then be effectively destroyed on cross-examination—without the necessity for the defendant to put on any further evidence

with respect to the incident. Examples of this situation will be found in the Alvin Nelson and Orris Smith incidents.

### 4. *Analysis of Class-wide Claims of Discriminatory Discharge*

The Court has found the plaintiff's purported statistical inferences impeached and has further concluded that the plaintiff's "whole universe" numbers do not significantly reinforce any evidence of disparate treatment of the plaintiff class by the defendant with regard to terminations. The Court has also found no merit in the bulk of the individual instances of alleged discriminatory discharge presented by the plaintiff. Only three of the plaintiff class members who testified have unexplained discharges. As to the other fifteen class members who testified, the Court is convinced that they were discharged for reasons which were completely unrelated to their race. Clearly, the defendant's officers and agents had no motive or intent to discriminate against any class member because of his or her race.

■ Having thoroughly reviewed the statistical and individual evidence, the Court is convinced that there has been no showing of any class-wide discrimination by the Camelot on the basis of race with regard to terminations of its employees. The Court has found for the defendant in fifteen of the eighteen individual instances of alleged discrimination presented, specifically finding no racial discrimination. Three of the allegedly discriminatory discharges remain unexplained. In these cases there is an absence of records and witnesses which could or might reveal the true reasons for such discharges. Although these three instances might (and certainly Ms. Bogard's claim would) provide a basis for individual relief under the law, they do not mandate a finding of class-wide discrimination by this Court. Neither do they, when considered in conjunction with the other evidence, convince the Court that the defendant has engaged in discrimination against black employees. There is nothing in the evidence of the three instances which suggests class-wide discrimination or which specifically indicates that race played any part even in those instances. And, as indicated, the "whole numbers" evidence, although somewhat supportive of the plaintiff class' claims, does not convince the Court of any class-wide racial discrimination, especially after those numbers are properly analyzed and explained. *See also* the Court's Memorandum and Order of March 27, 1980.

■ Even if it were to be assumed that plaintiff had made out a prima facie case of a class-wide practice of discriminatorily discharging black employees, such prima facie case would, nevertheless, have been overcome by the defendant, which has proved that it has routinely and systematically made its discharge decisions without regard for race, but rather for good cause, to wit, legitimate business reasons. The plaintiff has not shown that the defendant's claimed policy and practice of discharging employees for valid business reasons is pretextual, *i. e.,* a coverup for racially influenced terminations. In fact, in every instance of discharge for which the defendant has offered an explanation, the Court has found a legitimate, nondiscriminatory reason for the discharge which was not pretextual.

For these reasons, the Court concludes that the plaintiff has failed to prove a case of race discrimination in employment on behalf of the class certified and that relief must be denied as to that class. Having already concluded that all of Mr. McCarther's individual claims must be dismissed, the Court will also deny any relief to him personally. Judgment will be entered against Mr. McCarther and the class he has represented and for the defendant.

It is therefore Ordered that the complaint be, and it is hereby, dismissed and that the relief prayed for on behalf of the plaintiff James McCarther and on behalf of the class he has represented herein be, and it is hereby, denied.

It is further Ordered that judgment be entered against the plaintiff James McCarther and against the class he has represented consisting of "all black employees and ex-employees of the Camelot who

claim to, or who might claim to, have been involuntarily terminated by the Camelot for racially discriminatory reasons at any time on or before April 4, 1980." [4]

It is further Ordered that judgment be entered for the defendant Camelot Inn of Little Rock.

---

**4.** April 4, 1980, is the date on which the trial of this case was concluded.